**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **WALTER and LOUISE HORTON TUHRO FAMILY LIMITED PARTNERSHIP,** : | |
| : | |
| **Plaintiff** : | **CIVIL ACTION NO. 3:13-1364** |
| **v.** : | **(JUDGE MANNION)** |
| **CHESAPEAKE APPALACHIA, LLC,** : **STATOIL USA ONSHORE PROPERTIES, INC., and** : **ANDARKO E&P COMPANY LP,** | |
| : | |
| **Defendants** | |

## MEMORANDUM

Plaintiff Walter and Louise Horton Tuhro Family Limited Partnership ("Tuhro Partnership") seeks a new gas lease after their lease expired in September of 2011. The gas companies refused to give plaintiff a new lease since plaintiff's property was included in a gas drilling unit and the lease stated that production of oil and gas in that unit or the drilling of a well in that unit followed by the tender of shut-in royalties will continue the original lease's term. Pending before the court are: (1) a motion for summary judgment with respect to plaintiff's amended complaint filed on behalf of defendant Andarko E&P Company ("Andarko"), (Doc. 43); and (2) a motion for summary judgment with respect to plaintiff's amended complaint filed on behalf of defendants Chesapeake Appalachia, LLC ("Chesapeake"), and Statoil USA Onshore Properties, Inc. ("Statoil"), (Doc. 47). The defendants also seek summary judgment with respect to their counterclaims against plaintiff. For the reasons stated below, the motions of defendants will be **GRANTED**.

## I.   PROCEDURAL HISTORY

On April 12, 2013, an action was commenced against Chesapeake by the original plaintiffs Richard and Mary Tuhro (the "Tuhros") by filing a complaint in the Court of Common Pleas of Bradford County seeking a declaratory judgment against Chesapeake. (Doc. 1-2). Specifically, the Tuhros sought declaratory relief regarding the oil and gas lease they held regarding their 157 acres of land in Sheshequin Township, Bradford County, Pennsylvania, (the "Property"), and requested a declaration that Chesapeake had no rights under the lease. On May 17, 2013, Chesapeake removed this case of federal court pursuant to 28 U.S.C. §§1332, 1441, and 1446. (Doc. 1). On May 24, 2013, Chesapeake filed a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). (Doc. 4). In response, the Tuhro Partnership filed an amended complaint for declaratory judgment on July 3, 2013, against Chesapeake, Statoil and Andarko, along with several exhibits. (Docs. 12, 14, 17, 18, 19, 20, 21). Chesapeake's motion to dismiss the original complaint was dismissed as moot. (Doc. 22).

On September 3, 2013, defendants Chesapeake and Statoil filed an answer to the amended complaint with affirmative defenses and a counterclaim against the Tuhro Partnership, along with exhibits. (Doc. 23, Docs. 23-1 to 23-5). On November 8, 2013, defendant Andarko filed an answer to the amended complaint with affirmative defenses and a counterclaim against the Tuhro Partnership. (Doc. 30). On April 21, 2014, the Tuhro Partnership filed answers to the counterclaims of Chesapeake and

Statoil, and of Andarko. (Doc. 38, Doc. 39).

After discovery was completed, on September 5, 2014, defendant Andarko and defendants Chesapeake and Statoil filed motions for summary judgment with respect to the Tuhro Partnership's amended complaint and with respect to their counterclaims. (Doc. 43, Doc. 47, respectively). Accompanying the motions were supporting briefs and exhibits, (Doc. 45, Andarko, Doc. 48, Chesapeake and Statoil), as well as statements of material facts, (Doc. 44, Andarko, Doc. 49, Chesapeake and Statoil). Tuhro Partnership filed briefs opposing both of the defendants' motions on October 17, 2014.[1] (Doc. 52, Doc. 53). Tuhro Partnership did not respond to Anadarko's statement of material facts or to Chesapeake and Statoil's statement of material facts. On October 31, 2014, the defendants each filed their reply briefs and exhibits were submitted by Chesapeake and Statoil. (Doc. 54, Doc. 55, Doc. 55-1, Doc. 55-2).

## II.   STANDARD OF REVIEW

The defendants' motions for summary judgment are brought  pursuant to the provisions of Fed.R.Civ.P. 56. Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

---

[1]The opposition briefs of Tuhro Partnership to the defendants' motions are essentially identical.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Cas. & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is

4

some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).  However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial."  Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

In determining the existence of an issue of material fact, the reviewing court must consider the evidence in the light most favorable to the nonmoving party. White v. Westinghouse Electric Co., 862 F.2d 56, 59 (3d Cir. 1988). As such, the court must accept the nonmoving party's allegations as true and resolve any conflicts in his or her favor. *Id.* (citing Gans v. Mundy, 762 F.2d 338, 340 (3d Cir. 1985), cert. denied, 474 U.S. 1010 (1985); Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), cert. denied, 429 U.S. 1038 (1977).

The Federal Declaratory Judgment Act states that "in case of actual controversy within its jurisdiction ... any court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201(a). The United States Supreme Court has

held that "district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdiction prerequisites." Wilson v. Seven Falls Co., 515 U.S. 277, 282 (1995). The Third Circuit has held that "federal courts should hesitate to entertain a declaratory judgment action where the action is restricted to issues of state law." Atl. Mut. Ins. Co. v. Gula, 2003 WL 22962947, at *2 (3d Cir., Dec. 17, 2003)."Declaratory relief is within the sound discretion of the district court to grant, and in deciding whether to do so the court is obliged to consider 'facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution.'" Stewart v. SWEPI, LP, 918 F.Supp.2d 333, 339 (M.D.Pa. 2013) (citation omitted).

## III.    MATERIAL FACTS

As indicated above, the defendants have each filed a statement of material facts in support of their respective motions for summary judgment and Tuhro Partnership has not responded to them as required by Local Rule 56.1, M.D.PA. Since defendants have properly filed their statement of material facts in support of their motions for summary judgment, as required by Local Rule 56.1, M.D. PA., and their facts are properly supported by citation to the record, and since Tuhro Partnership has not responded to them, (Doc. 54, at 1-2, Doc. 55, at 5) the court will deem as admitted their facts contained in their statements. *See* Carpenter v. Kloptoski, 2012 WL 911558, *1 (M.D. Pa. March 16, 2012) ("Because Plaintiff  has failed to file a separate statement of

material facts controverting the statement filed by Defendant, all material facts set forth in Defendant's statement [] will be deemed admitted.").[2]

Based upon a review of those statements, the following are the facts which are undisputed.[3] On September 27, 2006, the Tuhros knowingly and voluntarily executed an oil and gas lease covering the Property (the "Lease") with East Resources, Inc. ("East Resources"). (Doc. 14, Doc. 55-1). The Tuhros are Tuhro Partnership's predecessor-in-interest with respect to the oil and gas underlying the Property and the Lease. The Tuhro Partnership is a family limited partnership formed by the Tuhros. The Tuhros are the managing members of the limited liability company that is the family limited partnership's

---

[2]In the case of *Barthalow v. David H. Martin Excavating, Inc.*, 2007 WL 2207897, * 1 n. 5, (M.D.Pa. 2007), the court noted:

> The Middle District of Pennsylvania's Local Rule of Court 56.1 provides that a summary judgment motion must include a separate concise statement of material facts. M.D.Pa. Local R. 56.1. The rule also requires that an opposition to a summary judgment motion must similarly include a statement that "responds to the numbered paragraphs set forth in [the moving party's concise statement of material facts], as to which it is contended that there exists a genuine issue to be tried." *Id.* Moreover, "[a]ll material facts set forth in [the moving party's statement] will be deemed to be admitted unless controverted by the [opposing party's statement]." *Id.*

[3]As the defendants' statements of material fact substantially overlap, the court has combined them for purposes of considering both motions for summary judgment.

general partner. The Tuhros manage and control the Tuhro Partnership. The limited partners in the Tuhro Partnership are the Tuhros and their children.

There is no dispute that the Lease is a contract that binds the lessee (East Resources) and the lessors (the Tuhros) and their successors and assigns. The Lease provided that the Tuhros lease their Property "exclusively to Lessee, its successors and assigns, ... for the purpose of exploring for, developing, producing and marketing oil and gas along with all hydrocarbon substances produced in association therewith by all methods now known or hereafter known or hereafter discovered, in and under [the Property.]" The Lease is for a defined primary term, and it can be extended beyond that primary term if certain conditions specified in the Lease are satisfied. Paragraph 3 of the Lease defines the primary term as follows:

> (3) **TERM** - Subject to the other provisions contained herein, this lease shall be in force for a primary term of <u>Five</u> years from <u>27 September 2006</u>, hereinafter called the "Effective Date", and for so long thereafter as oil, gas or other substances covered hereby are produced in paying quantities from the leased premises or from lands pooled therewith or this lease is otherwise maintained pursuant to the provisions hereof.

The primary term of the Lease ran until September 27, 2011, and the Lease would expire on this date if its term was not extended by the production of oil and gas in paying quantities or the happening of one of the other conditions specified in the Lease. One of the conditions that allows the Lease to be extended beyond September 27, 2011, was specified in paragraph 12, titled "Shut-In Royalty". Paragraph 12 of the Lease provides, in pertinent part, as follows:

8

(12) **SHUT-IN ROYALTY** - If during or after the primary term of this lease, all wells on the leased premises or within a unit that includes all or a part of the leased premises, are shut-in, suspended or otherwise not producing for any reason whatsoever for a period of twelve (12) consecutive months, and there is no current production of oil or operations on said leased premises sufficient to keep this lease in force and this lease is not otherwise kept in force by other provisions of this lease, Lessee may maintain this lease in effect by tendering to Lessor a shut-in royalty equal to the Delay Rental as found elsewhere in this lease.

Thus, it is undisputed that under paragraph 12 the primary term of the Lease can be extended if shut-in royalty payments "equal in amount" to the delay rental payment defined in paragraph 6 of the Lease as $5 per acre are made pursuant to the Lease.

The Lease also provides for pooling which allowed the Property to be grouped together with a number of other leased properties and certain things that were done to the pool applied to all of the properties. Paragraph 9 of the Lease deals with pooling and provides, in pertinent part, as follows:

(9) **POOLING** - Lessee is hereby granted the right to pool or unitize the leased premises, or any part thereof, with any other property for the production of any substance covered hereby, so as to create one or more drilling or production units. Said drilling or production units shall not exceed six hundred forty (640) acres or such size as may be required to conform to the rules and regulations of any governmental agency claiming jurisdiction. In the event this lease is so unitized, the Lessor agrees to accept in lieu of the royalty herein before recited, such proportion of the royalty above provided as the acreage contributed by this lease bears to the total acreage comprising the unit.

*******************************************************

Production, drilling or reworking operations anywhere on a unit

9

which includes all or any part of the leased premises shall, except for the payment of royalties, be treated as if it were production, drilling or reworking operations on the leased premises.

On December 1, 2009, East Resources assigned its interest in the Lease to Chesapeake and Statoil, and Chesapeake and Statoil assigned a portion of their interest in the Lease to Anadarko.

On June 15, 2012, the Tuhros conveyed to the Tuhro Partnership their interest in the oil and gas underlying the Property, and the Tuhro Partnership then acceded to the lessor interest in the Lease. As such, Chesapeake, Statoil, and Anadarko currently hold the lessee interest in the Lease, and the Tuhro Partnership currently holds the lessor interest in the Lease.

Prior to the expiration of the primary term, i.e., September 27, 2011, the Lease was placed into a pool. Part of the Tuhro Partnership's acreage covered by the Lease was included in the Herr Unit, which was established effective March 14, 2011, and the Declaration and Notice of Pooled Unit ("DPU") was recorded in the Bradford County Recorder of Deeds Office on September 12, 2011. The Declaration and Notice of Pooled Unit provides that "operations and/or production (or the equivalent as in the case of shut-in payments) anywhere within the Unit shall be deemed to be operations and/or production on each separate tract sufficient to extend and maintain each included lease in the Unit."

On May 19, 2011, a well permit was issued for the Herr 3H Well, located

10

on a neighboring property that was also pooled in the Herr Unit. Chesapeake then proceeded to drill the Herr 3H Well pursuant to the permit. The Herr 3H Well was completed on August 15, 2011, i.e., prior to September 27, 2011, when the primary term of the Tuhro Partnership's Lease would have expired. Thus, the Property was in the Herr Unit and a well had been drilled on this unit, i.e., the Herr 3H Well, prior to the expiration of the Lease's primary term.

On August 19, 2011, Chesapeake mailed a shut-in royalty check in the amount of $785 ($5 per acre) to the Tuhros, representing the shut-in royalty payment for the period from September 27, 2011 to September 27, 2012. The Tuhros received the check on August 29, 2011. On August 3, 2012, Chesapeake mailed a second shut-in royalty check in the amount of $785 to the Tuhros, representing the shut-in royalty payment for the period from September 27, 2012 to September 27, 2013. The shut-in royalty check was received by the Tuhros on September 6, 2012, but it was not cashed. Richard Tuhro stated that he thought the Lease expired as of September 27, 2011. (Doc. 45-1, at 15-17). Richard Tuhro admitted that it was his understanding that the primary term of the Lease could be extended if shut-in payments were made pursuant to the Lease and that the shut-in payments were made to extend the Lease in this case. (Doc. 45-1, at 26).

On September 20, 2012, the Herr 3H Well was placed online and began producing gas, and the well has continued to produce gas since then. When the well was brought on-line, Chesapeake, Statoil, and Anadarko issued a division order in January of 2013 to the Tuhro Partnership, identifying the

Tuhro Partnership's  percentage interest in royalties paid on the production of gas from the Herr Unit. The division order was returned as undeliverable with no forwarding address, and thus the Tuhro Partnership's account has been placed in suspense since that time. Chesapeake, Statoil, and Anadarko have tendered production royalty checks to the Tuhro Partnership since the Herr 3H Well has been producing. Richard Tuhro admitted that all payments made to the Tuhro Partnership pursuant to the Lease were timely made.

The Tuhro Partnership did not provide notice and an opportunity to cure any alleged violations of the Lease to any of the defendants.

## IV.    DISCUSSION[4]

Since this case is in federal court based on diversity jurisdiction, the court must apply the substantive law of Pennsylvania. Lafferty v. St. Riel, 495 F.3d 72, 76 (3d Cir. 2007) (citation omitted).

The case of Messner v. SWEPI, LP, 2013 WL 4417723 (M.D.Pa. August 14, 2013), affirmed by 574 Fed.Appx. 96 (3d Cir. 2014), is directly on point with the present case. In *Messner*, the court considered a motion to dismiss a declaratory judgment action almost identical to the instant case. The plaintiff in *Messner* entered into an oil and gas lease, mirroring the instant lease, with East Resources regarding his 160-acre property. The plaintiff sought the court to declare that the lease agreement between the parties had

---

[4]Since the arguments raised in the defendants' briefs substantially overlap, the court considers their briefs collectively.

been terminated. The lease in *Messner*, like the instant lease, had a primary term of five years commencing on October 16, 2006, allowed for pooling and unitization, and contained a paragraph providing for a Shut–In Royalty payment. The Shut–In Royalty paragraph of the lease in *Messner* is identical, in pertinent part, to the Shut–In Royalty paragraph of the lease in the present case. Id., 2013 WL 4417723, *2. Also, like the instant case, plaintiff Messner's lease was placed into a pool, with two units, the Guindon Unit and the Ingalls Unit. Wells were then drilled on each unit and later shut-in. Defendant SWEPI, LP, the successor in interest to East Resources, tendered Shut–In Royalty payments to Messner pursuant to the terms of the lease. Messner refused to accept the Shut–In Royalty payments since he claimed that the lease expired. Messner then filed a lawsuit seeking to have the lease declared expired. Messner contended that "since there was no well producing oil or gas in paying quantities on the Messner Property or 'lands pooled therewith' on October 16, 2011, the Lease automatically expired and/or terminated at midnight on October 16, 2011, pursuant to paragraph 3 of the Lease and Pennsylvania law." Id.

In Stewart v. SWEPI, LP, 918 F.Supp.2d. at 339, the court stated:

Under Pennsylvania law, "a lease is in the nature of a contract and is controlled by principles of contract law." T.W. Phillips Gas and Oil Co. v. Jedlicka, 615 Pa. 199, 42 A.3d 261, 267 (Pa. 2012). The lease "is to be construed in accordance with the terms of the agreement as manifestly expressed." J.K. Willison v. Consolidation Coal Company, 536 Pa. 49, 637 A.2d 979, 982 (Pa. 1994), and the language of the lease should be given its "accepted and plain meaning, rather than the silent intentions of

the contracting parties." T.W. Phillips, 42 A.3d at 261. The burden of proof is borne by the party seeking to terminate the lease. Id. at 267 (citing Jefferson Cnty. Gas Co. v. United Natural Gas Co., 247 Pa. 283, 93 A. 340, 341 (Pa. 1915)).

The court in Messner, 2013 WL 4417723, *4-*5, stated:

Under Pennsylvania law it is well settled that a court is required to construe the entire language of the contract and avoid a construction and interpretation that would render certain language to be surplusage or a nullity. See, e.g., Murphy v. Duquesne Univ. ., 565 Pa. 571, 777 A.2d 418, 429 (Pa. 2001) ("The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent."); Pritchard v. Wick, 406 Pa. 598, 178 A.2d 725, 727 (Pa. 1962); see also Great Am. Ins. Co. v. Norwin Sch. Dist., 544 F.3d 229, 243 (3d Cir. 2008).

As in *Messner*, the same form lease in the present case had a five-year primary term that began on September 27, 2006, the leased acreage of the Tuhro Partnership was pooled, and a well was drilled on the Herr Unit during the primary term of the lease. The undisputed facts reveal that  the Herr 3H Well was initially shut-in, but later placed online and began producing gas. After the well was brought on-line, Chesapeake, Statoil, and Anadarko issued a division order to the Tuhro Partnership, specifying the partnership's percentage interest in royalties paid on the production of gas from the Herr Unit. Chesapeake, Statoil, and Anadarko then tendered production royalty

checks to the Tuhro Partnership since the Herr 3H Well has been producing.

Based on similar facts in *Messner*, the court stated, "[t]hese facts, ...,
place this dispute squarely within the scope of the Shut–In Royalty provision,
and we see no reason why the plain language of this provision does not
compel the conclusion that SWEPI complied with the terms of the lease, and
properly exercised its right to maintain the lease in effect by tendering the
shut-in royalty payment ...." 2013 WL 4417723, *5. In the instant case,
paragraph 9 of the Lease pertaining to pooling provided: "Production, drilling
or reworking operations anywhere on a unit which includes all or any part of
the leased premises shall, ... , be treated as if it were production, drilling or
reworking operations on the leased premises." The DPU recorded in the
county also specifically provided that "operations and/or production ...
anywhere within the [Herr] Unit shall be deemed to be operations and/or
production on each separate tract sufficient to extend and maintain each
included lease in the Unit." Paragraph 12 of the Lease stated that the primary
term of the Lease can be extended if the shut-in royalty payments "equal in
amount" to the delay rental payment are made pursuant to the Lease. There
is no dispute that shut-in royalty payments were timely tendered to the Tuhro
Partnership while the Herr 3H Well was shut-in.

The Tuhro Partnership argues that there is no evidence to show that the

15

shut-in royalty provision was specifically negotiated and thus, there is a genuine issue of material fact as to whether the parties had a meeting of the minds regarding this provision. The Tuhro Partnership also argues that a genuine issue of material fact exists as to whether the Herr 3H Well was drilled and completed before the primary term of the Lease expired. The Tuhro Partnership states that just because defendants showed a permit was issued for the well this does not demonstrate drilling occurred prior to the expiration of the primary term of the Lease. Despite the shut-in royalty payments they received, the Tuhro Partnership further contends that evidence is lacking to show that the Herr 3H Well was actually shut-in before the expiration of the primary term of the Lease. They maintain that if the well was not really shut-in, then the royalty payment provision of the Lease is unenforceable. As such, the Tuhro Partnership concludes that defendants cannot meet the standard set forth in the *Messner* case. The Tuhro Partnership additionally argues that there is no evidence to show that gas was produced from the Herr 3H Well in paying quantities before the primary term of the Lease expired.

Initially, to the extent the Tuhro Partnership suggests that there was ambiguity in the Lease and that ambiguous terms must be construed against the defendant lessees, the terms quoted above are direct and clear. "[T]he clear and unambiguous language of the Lease controls." Neuhard v. Range Resources-Appalachia, LLC, 29 F.Supp.3d 461, 479 (M.D.Pa. 2014) (citation omitted). The Lease in the instant case was the same form lease used by

16

East Resources which the court considered and gave full effect to the intent of the parties in *Messner*. The court in *Messner* stated "Pennsylvania law requires that we give full effect to the language in the lease, and not to read out of the lease provisions that the parties opted to include, such as each of the triggering conditions included in the Shut–In Royalty provision. The parties chose this language, and it must be given effect." 2013 WL 4417723, *6. (citing Pritchard, 178 A.2d at 727 ("It is a rule of universal application that in construing a contract each and every part of it must be taken into consideration and given effect if possible....")))." Also, Richard Turho admitted that he knowingly and voluntarily signed the Lease, and that each provision of the Lease is binding on all parties. (Doc. 55-1). Further, as defendant Andarko states "[n]or has [the Tuhro Partnership] ever contended or presented any evidence that the shut-in royalty provision was placed in the Lease through some fraud, accident, or mistake." (Doc. 54, at 3).

As defendants alleges in their reply briefs, the Tuhro Partnership attempts to manufacture genuine issues of material fact where none exist as to the relevant evidence in this case. Indeed, the Tuhro Partnership gives short shrift to the express terms of the Lease and tries to read in ambiguities that are not supported by the language in the Lease. "The object in interpreting instruments relating to oil and gas interests, like any written instrument, 'is to ascertain and effectuate the intention of the parties.'" Szymanowski v. Brace, 2009 Pa.Super. 218, 987 A.2d 717, 720 (Pa.Super.Ct. 2009) (quoting Hess v. Jones, 335 Pa. 569, 7 A.2d 299 (1939)). The Tuhro

Partnership's argument that there is a disputed issue of material fact as to whether a well was drilled and shut-in before the primary term of the Lease expired is of no merit since, as detailed above, Richard Tuhro admitted these facts on behalf of the Partnership in the Rule 30(b)(6) deposition. Also, the Tuhro Partnership has not pointed to any evidence in the record that contradicts Richard Turho's own admissions.

Moreover, Alex Kaiser, a Landman II for Chesapeake who is responsible for overseeing land and lease acquisitions in the relevant location and is aware of the progression of wells drilled in this area, avers in his Affidavit, (Doc. 55-2), as follows:

> 5. By August 15, 2011, the drilling of the Herr 3H Well was completed.
> 6. Within days of the Herr 3H Well's completion, the decision was made to shut that well in, and Chesapeake did so. A "shut-in" well is a well which has been drilled, and is capable of producing natural gas, but for some reason cannot begin to do so immediately after the completion of the drilling process.
> 7. Chesapeake shut in the Herr 3H Well because at the time of its completion there was no available pipeline through which gas from the Herr 3H Well could be transported.
> 8. Chesapeake sent shut-in payments to [the Tuhros] on August 19, 2011 - only four (4) days after the completion of the drilling process - and August 3, 2012, pursuant to the terms of the Lease.
> 9. On September 17, 2012, the Herr 3H Well was connected to a pipeline, the shut-in of the Herr 3H Well ended, and that well began producing natural gas.
> 10. The Herr 3H Well has been in continuous production since that time.

Thus, the Herr 3H Well was undisputedly shut-in for a period of time and shut-in payments were made to the Tuhro Partnership. As the *Messner* Court

18

found under the same circumstances, the Lease was extended under the shut-in royalty provision beyond the primary term.

Next, the Tuhro Partnership contends that the lack of production of natural gas in paying quantities prior to the expiration of the primary term caused the Lease to expire. This contention is of no merit. Paragraph 3 of the Lease provides that "this lease shall be in force for a primary term of Five years from 27 September 2006, ... , and for so long thereafter as oil, gas or other substances covered hereby are produced in paying quantities from the leased premises or from lands pooled therewith **or this lease is otherwise maintained pursuant to the provisions hereof**." (emphasis added). As explained, the shut-in royalty provision (paragraph 12 ) is a provision to which paragraph 3 refers allowing the Lease to be otherwise maintained after the primary term. Also, there is no dispute that the Lease was maintained during the time that the Herr 3H Well was shut-in by the tender of shut-in royalties.

Additionally, the Tuhro Partnership's reliance on Hite v. Falcon Partners, 13 A.3d 942 (Pa. Super. 2011), is misplaced. The *Hite* case dealt with a lease provision for payment of delay rentals as opposed to a shut-in royalty provision which is at issue in the present case. Id. at 946-47. The *Hite* case did not concern a shut-in provision that like the Shut–In Royalty paragraph in the present case, which authorized defendants to tender payments if a producing well was shut-in, and also tender payments when a well was suspended, or "not producing for any reason whatsoever." When the Herr 3H Well was completed it was shut-in for a time as Kaiser avers since there was

no available pipeline to transport gas from the Herr 3H Well and the Tuhro Partnership was paid royalties during this time.

The court follows the well-reasoned decision in *Messner* which was affirmed by the Third Circuit. Further, as Andarko, (Doc. 54, at 6), explains: "In *Hite*, there was no production and there were no efforts to make production. Here, Chesapeake actually unitized the property, actually undertook the significant investment to drill and complete a well, which was actually brought on-line and is producing after being shut-in for the minimal period of one year." *See* Linder v. SWEPI, LP, 549 Fed.Appx. 104, 107 n. 5 (3d Cir. 2013) (Third Circuit Court noted that plaintiff's reliance on *Hite* was "unavailing because the Lease [in *Linder* was] extended by SWEPI's productive activity on the leasehold, not by the payment of delay rental."); Mason v. Range Resources-Appalachia, LLC, 2014 WL 1572431, *13 (W.D. Pa. April 16, 2014) ("[T]he [*Hite*] court held that delay rentals function to relieve the lessee of the obligation to develop the leasehold during the primary term of the lease[]" and, "[b]ecause the lessee had not developed the leasehold during the primary term, the mere payment of delay rentals alone would not preserve the lessee's drilling rights indefinitely.").

In giving full effect to the Lease as required under Pennsylvania law, Neuhard, 29 F.Supp.3d at 467 ("A court must consider the [agreement's] text as a whole when construing the language's operative effect."), and based on *Messner*, the stated lease provisions are unambiguous and enforceable, and demonstrate that defendants were expressly allowed to maintain and extend

the Lease past the primary term and that they complied with these provisions.
As such, defendants properly extended the Lease. *See* Messner v. SWEPI,
LP, 574 Fed.Appx. at 98.


## V.      CONCLUSION

Therefore, the motions for summary judgment of defendants, (Doc. 43,
Doc. 47), will be granted with respect to plaintiff's amended complaint and
with respect to defendants' counterclaims seeking a declaration that the
Lease had not expired. Specifically, the Lease was maintained and extended
by the completion of the Herr 3H Well within the Herr production unit into
which a portion of the plaintiff's leased acreage was pooled before the primary
term of the Lease expired, by the timely tender of shut-in royalty payments
during the period when the well was shut-in, and then by the production of gas
from the Herr 3H Well. An appropriate order will be issued.




                                        s/ *Malachy E. Mannion*
                                        **MALACHY E. MANNION**
                                        **United States District Judge**

**Date:  June 18, 2015**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-1364-01.wpd




21